UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
--------------------------------------------------------

|                                        |   |                                      |
|----------------------------------------|---|--------------------------------------|
|                                        | : |                                      |
| JELINI DORSEY & KEVIN CLARK,           | : | CASE NO. 5:04-CV-2151                |
|                                        | : |                                      |
| Plaintiffs,                            | : |                                      |
|                                        | : |                                      |
| vs.                                    | : | OPINION AND MEMORANDUM               |
|                                        | : | [Resolving Doc. Nos. 68, 69, 97, 98] |
|                                        | : |                                      |
| JOHN BARBER, et al.                    | : |                                      |
|                                        | : |                                      |
| Defendants.                            | : |                                      |
|                                        | : |                                      |

--------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On October 26, 2004, Plaintiffs Jelini O. Dorsey ("Dorsey") and Kevin L. Clark ("Clark") sued Defendants State Park Ranger John Barber ("Barber"), Officer Lindsey S. Woodward ("Woodward"), Officer Charles Mendenhall ("Mendenhall"), Officer Al Begin ("Begin"), and Officer Duane M. Dawson ("Dawson"), in their individual and official capacities. In addition, Plaintiffs also sued Defendants Village of Brady Lake ("Brady Lake"), Portage County ("Portage"), the City of Ravenna ("Ravenna"), and the State of Ohio. In their complaint, Plaintiffs assert three causes of action. They allege that Defendants: (1) interfered with voter registration in violation of the Voting Rights Act of 1965, 42 U.S.C. § 1973(b) and the Help America Voting Act of 2002 (HAVA), 42 U.S.C. § 15521; (2) used excessive force and unlawfully detained, falsely arrested and imprisoned, and defamed Plaintiffs in violation Plaintiffs' Fourteenth Amendment rights of due process and equal protection under 42 U.S.C. § 1983; and (3) engaged in racial profiling in violation of Plaintiffs' Fourteenth Amendment rights under 42 U.S.C. § 1983. Plaintiffs further allege that Defendants Brady Lake and Ravenna refused to respond to a legitimate public records request

Case No. 5:04-CV-2151
Gwin, J.

in violation of the Ohio Public Records Act, Ohio Rev. Code § 149.43.[1/]

Defendants have filed several motions, including a: (1) Motion for Summary Judgment, filed by Defendants Mendenhall and Woodward on May 23, 2005 [Doc No. 68]; (2) Motion for Judgment on the Pleadings, filed by Defendant State of Ohio on May 23, 2005 [Doc. No. 69];[2/] (3) Motion for Summary Judgment filed by Defendants Brady Lake and Begin on June 13, 2005 [Doc. No. 98]; and (4) Motion for Summary Judgment filed by Defendants Barber, Duane Dawson, and Portage on June 13, 2005 [Doc. No. 97]. Plaintiffs oppose the Defendants' motions. [Doc. Nos. 76, 140, 142].

With regard to Plaintiffs' voting rights claims, Defendants argue that the Voting Rights Act of 1965, 42 U.S.C. § 1973(b) does not apply because Plaintiffs have not shown that the Defendants interfered with their right to vote on the basis of race or color. Defendants further argue that the Help America Voting Act of 2002 (HAVA), 42 U.S.C. § 15521 does not create a private cause of action. As to Plaintiffs' § 1983 claims, Defendants State of Ohio, Mendenhall, and Woodward claim absolute immunity under the Eleventh Amendment of the United States Constitution. Similarly, Defendants Brady Lake and Portage argue they are entitled to qualified immunity for the claims against themselves and their employees because Plaintiffs cannot show that either municipality engaged in a policy or custom that deprived Plaintiffs of their

---

[1/] Plaintiffs have since voluntarily dismissed their claims against Defendant Ravenna [Doc. No. 30] and their claims against Defendants Woodward and Mendenhall in their individual capacities [Doc. No. 108].

[2/] The State of Ohio filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In its motion, the State of Ohio incorporated the arguments from Defendants Mendenhall's and Woodward's motion for summary judgment, which presented matters outside of the pleadings. Because the Court has not excluded these matters, the Court is converting the State of Ohio's motion for judgment on the pleadings to one for summary judgment and will dispose of it as provided in Rule 56 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 12(c). The parties have received ample opportunity to present all material made pertinent to such a motion because all of the other defendants filed motions for summary judgment.

Case No. 5:04-CV-2151
Gwin, J.

constitutional rights.  Finally, Defendants Barber, Dawson, and Begin, as sued in their individual capacities,

argue (1) that Plaintiffs' excessive force and wrongful arrest or seizure claims are improperly pled as such

claims fall under the Fourth rather than the Fourteenth Amendment to the United States Constitution, (2)

that Plaintiffs cannot prove that Defendants engaged in racial profiling because they acted reasonably in

identifying the Plaintiffs as suspects in the vehicle theft based on the available suspect descriptions and were

not motivated by any discriminatory purpose or intent, and (3) that they are entitled to qualified immunity

because Plaintiffs cannot show either that Defendants violated their Constitutional rights or that Defendants

conduct was not objectively and legally reasonable.

As discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants'

motions.

<u>**BACKGROUND**</u>

The present dispute arises from Defendants' detention and arrest of Plaintiffs Dorsey and Clark on

July 10, 2004.  Plaintiffs basically allege that Defendants targeted them as suspects in a vehicle theft solely

on the basis of race, resulting in Defendants wrongfully detaining, arresting, and using excess force against

Plaintiffs in violation of their constitutional rights.  The Plaintiffs say they have proven that they had no

connection with the car theft and no probable cause supported their arrest.  The following facts are relevant

to the determination of the issues described above.

I.       Events of the Early Morning of July 10, 2004

On July 10, 2004, at approximately 6:14 a.m., Defendant Mendenhall, a white Ohio State Highway

Patrol (OSHP) Trooper assigned to the Ravenna patrol post, was traveling eastbound on State Route 5

Case No. 5:04-CV-2151
Gwin, J.

("SR 5") in Portage County when he allegedly observed two red Dodge Neons traveling westbound at a high rate of speed.  Clocking the first Neon at 91 mph, Defendant pursued the vehicle.  The driver refused to stop, and Mendenhall eventually ceased pursuit due to dangerous road conditions.  After slowing his speed, Mendenhall continued southbound on SR 225 until he came across an abandoned red Dodge Neon, which appeared to have crashed into a ravine.

Defendant Mendenhall notified the OSHP dispatcher of the accident and moments later and at approximately 6:25 a.m., OSHP Sergeant Duerr and Defendant Woodward arrived on the scene.  Shortly thereafter, a dispatch advised the officers of a second abandoned red Dodge Neon located at the intersection of SR 5 and SR 225.  The officers conducted an investigation of the site of the first Neon, and ordered that both vehicles be towed and inventoried.  Further investigation revealed that the vehicles were stolen.  His shift having already ended, Defendant Mendenhall went off duty at approximately 8:04 a.m. and returned to his residence.  He had no contact with either Plaintiff on the day in question.

Defendant Mendenhall was able to give some information regarding the identification of the driver of the Neon that he pursued, though the extent of his ability to describe the suspects involved in the incident is largely unclear.  Mendenhall claims that he did observe the driver of the first vehicle, describing him as a black male wearing a white t-shirt and a light-colored dew rag on his head.  He also claims that he could not determine if there were passengers in the first vehicle and that he did not observe the driver of the second vehicle.  In contrast, Defendant Woodward alleges that when he arrived at the scene, the only description that Mendenhall could offer was that the driver of the first vehicle was wearing a white due rag.  In conflict with both of the above allegations are the suspect reports for the July 10, 2004, pursuit.  In these

-4-

Case No. 5:04-CV-2151
Gwin, J.

reports, Mendenhall describes three different individuals: (1) a black male about fifteen years of age,

approximately 5'10 to 5'11 feet tall and 155 to 160 lbs, wearing a white t-shirt, blue-jean shorts, and a light

colored due rag or hast on his head, (2)  a black male about twenty years of age, approximately 5'6 to 5'8

feet tall and 170 to 180 lbs, wearing a blue-grey shirt and blue jeans, with cornrows in his hair, (3) a third

suspect described only as the driver of the second vehicle.

It is further unclear what if any part of Defendant Mendenhall's description was transmitted to the

OSHP dispatcher on the morning  in question.  Allegedly, around 8:00 a.m., OSHP dispatcher Sheri D.

Smith ("Smith") did receive a call from Robert S. Robinson ("Robinson"), who gave a description of two

individuals he suspected were involved in the morning incident.  Specifically, he informed Smith that while

on his way to work that morning he picked up two young men on Whipporwhill Road and drove them to

the Ravenna Municipal Court Building.  Robinson stated that the young men appeared nervous, particularly

when they passed the officers and abandoned vehicles on SR 225.  Defendants claim that Robinson gave

the following description to Smith: "one black male appeared to be 19-20 years of age; one had cornrows

in his hair and was wearing a dark jersey (shirt); the other was wearing a white shirt and shorts."[3]  (Defs.

Mendenhall & Woodward's Mem. Supp. Summ J. 2).  Based on this description,[4] Smith issued a "Be On

the Look Out" (BOLO) notice to all OSHP officers and to the Ravenna Police Department.

II.       The Brady Lake Parade Events

---

[3]  The recordings of the call from Robinson to Smith have been destroyed; thus, Plaintiffs' allege that Robinson's actual description cannot be verified.

[4]  Dispatcher Smith did receive a call from another alleged witness, who described seeing a black male in his early 20's, about 5'5 to 5'7 feet tall with a stocky build, wearing a white t-shirt and dark pants, exit the first red Dodge Neon and run alongside it before it crashed into the ravine.  However, this witness did not contact the police until approximately 10:45 p.m. on the date in question, long after the events at issue transpired.

Case No. 5:04-CV-2151
Gwin, J.

Meanwhile, that same morning, Plaintiffs Clark and Dorsey traveled to Brady Lake, Portage County, Ohio for the purpose of registering voters at the Brady Lake Parade. Clark and Dorsey, who are both male African American college students, were working for the "America Coming Together" voter registration project at the time in question. Plaintiffs, along with six of their white colleagues, arrived at the parade site in Brady lake at approximately 8:00 a.m. and proceeded to encourage people in the crowd to register to vote.

Defendant Barber, a white Portage County Park Ranger, was in uniform and was driving the park district patrol vehicle in the Brady Lake Parade when he allegedly heard a BOLO referring to two suspects from the Dodge Neon incident. The source and content of this BOLO is in dispute. Plaintiffs allege, based on statements from Barber, that the BOLO described two black males wearing "sports clothing" who were wanted in connection with the police pursuit and vehicle theft. (Pls.' Resp. Defs. Portage County, Barber, and Dawson's Mem. Supp. Summ J. 4). Plaintiffs also allege that the source of this BOLO cannot be determined and that there is no record of any such BOLO being transmitted. In contrast, Defendants Barber, Dawson, and Portage maintain, based on statements from Smith and the dispatcher log, that the Ravenna Police Department issued the BOLO and that it contained the description given by Robinson to Smith earlier that morning.

In any case, Defendant Barber claims that he observed Plaintiffs Clark and Dorsey walking alongside the parade route in the opposite direction as traffic. Barber stated in his deposition that he does not recall seeing any other African American males in the area that morning. He further stated that the Plaintiffs were not engaged in any suspicious behavior. However, Defendant Barber says that he believed

-6-

Case No. 5:04-CV-2151
Gwin, J.

Plaintiffs matched the description given in the BOLO.  At approximately 10:25 a.m., Barber called Smith

and reported that he had seen two individuals matching the description of the suspects traveling along the

parade route near Westshore Drive and Merrill Road.  Smith transmitted this information to OSHP and

the Portage County Sheriff's office.  At 10:34 a.m. the Portage County Sheriff's Office issued a BOLO

to the Brady Lake Unit.  This BOLO stated that two black males matching the description of stolen vehicle

suspects were spotted at Westshore Drive and Merrill Road.  The BOLO also stated that one of the males

was wearing a white jersey and the other a blue jersey, and that one had cornrows in his hair.

Defendant Begin, a now retired Brady Lake Police Officer, was controlling traffic for the parade

on July 10, 2004.  Upon hearing the Portage County BOLO he proceeded to the Westshore Drive and

Merrill Road location.

Regarding Defendants Begin, Dawson, and Woodward's interaction with the Plaintiffs the following

facts are undisputed.  Shortly after hearing the BOLO, officer Begin spotted the Plaintiffs and stopped his

vehicle about twenty feet away from them.  Plaintiffs were walking away from Begin and were carrying only

clip boards and voter registration materials.  One of the Plaintiffs was wearing a light blue t-shirt, black

pants, a white dew rag, and white tennis shoes, and had cornrows in his hair.  The other Plaintiff was

wearing a white t-shirt, yellow or white shorts, a black baseball cap, and white tennis shoes. Defendant

Begin stated that the Plaintiffs were not doing anything suspicious.

When Begin got out of his car and asked Plaintiffs to stop, they turned around briefly, looked at

Begin, and then continued walking.  Begin stated that when they turned around it appeared as though the

Plaintiffs did not believe Begin was trying to stop them.  Defendant Begin asked the Plaintiffs to stop again

-7-

Case No. 5:04-CV-2151
Gwin, J.

and told them to put down their belongings and lie on the ground. Plaintiffs questioned why they were being

stopped and told Begin they had not done anything wrong.  Begin then drew his weapon and ordered

Plaintiffs to lie face down on the ground.  Plaintiffs complied and Defendant Begin continued to point his

weapon at Plaintiffs.  Defendant Dawson, a Portage County Police Officer arrived on the scene shortly

thereafter and handcuffed Plaintiffs.  Plaintiffs continued to lie handcuffed and face down on the pavement

until Defendant Woodward, who was dispatched to the scene, arrived.  Several officers were present at

this time, including Defendants, Begin, Dawson, and Barber.  Thereafter, Defendant Woodward

transported Plaintiff Clark and Defendant Dawson transported Plaintiff Dorsey to the Ohio State Patrol

Post in Ravenna.  They arrived at the post at approximately 11:03 a.m.  Robinson viewed the Plaintiffs and

confirmed that they were not the two individuals to whom he had given a ride that morning.  Defendants

then drove Plaintiffs back to Brady Lake and released them.

Several facts pertaining to these events remain in dispute. Plaintiffs maintain that throughout this

encounter they tried to explain that they were innocent and that they had been at the parade all day

registering voters.  They also claim that several of their white colleagues attempted to explain to the

Defendants that Plaintiffs were part of the voter registration team and that Defendants refused to listen to

the Plaintiffs or to verify their story.  Plaintiffs further maintain that Defendants forced them to lie handcuffed

and face down on the ground for at least twenty minutes, and that Defendants Begin, Dawson, and Barber

threatened Plaintiffs with bodily harm, cursed, and used unnecessary force.

In contrast, Defendant Begin denies that Plaintiffs ever tried to explain why they were in the Brady

Lake vicinity.  Begin also claims he holstered his weapon immediately after the Dawson handcuffed the

-8-

Case No. 5:04-CV-2151
Gwin, J.

Plaintiffs, whereas Plaintiffs suggest Begin continued to point his weapon for an unspecified period of time.

In addition, Begin claims that the Plaintiffs were forced to lie on the ground for only eight to ten minutes

before Woodward arrived, and Defendants Begin, Barber, and Dawson do not state when exactly Plaintiffs

were allowed to stand.  Defendant Woodward maintains that he helped Plaintiff Clark to stand immediately

upon arriving at the scene.  Finally, Defendants deny using any unnecessary force or inappropriate language

against the Plaintiffs.

## **LEGAL STANDARD**

Summary Judgment is appropriate where the evidence submitted shows that "there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  The Court enters summary judgment "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always

bears the initial responsibility of informing the district court of the basis for its motion, and identifying those

portions of the record that show the absence of a genuine issue of material fact.  *Id.* at 323.  A fact is

material if its resolution will affect the outcome of the lawsuit. *Daughenbaugh v. City of Tiffin*, 150 F.3d

594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

Once the moving party satisfies its initial burden, the burden shifts to the non-moving party who

"must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250

(quoting Fed. R. Civ. P. 56(e)).  The non-moving party cannot avoid summary judgment by resting on its

pleadings or reasserting its previous allegations.  It is insufficient "simply [to] show that there is some

-9-

Case No. 5:04-CV-2151
Gwin, J.

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586 (1986). Instead, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and

present evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court views the factual evidence and draws

reasonable inferences in favor of the non-moving party. *National Enters., Inc. v. Smith*, 114 F.3d 561,

563 (6th Cir. 1997). The Court must decide "whether the evidence presents sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal punctuation

omitted). "The mere existence of a scintilla of evidence in support of a plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Street v. J.C.

Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989) (citation and internal punctuation omitted). The

Court "is not . . . obligated to wade through and search the entire record for some specific facts that might

support the nonmoving party's claim." *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.

1989).

<u>**DISCUSSION**</u>

I.      Plaintiffs Voting Rights Claims

Plaintiffs sue Defendants under both the Voting Rights Act of 1965, 42 U.S.C. § 1973(b) and the

Help America Voting Act of 2002 (HAVA), 42 U.S.C. § 15521. They claim that Defendants violated

these acts by interfering with Plaintiffs' attempts to register voters while Plaintiffs were volunteering with the

America Coming Together program. Defendants contend that they are entitled to summary judgment as

-10-

Case No. 5:04-CV-2151
Gwin, J.

to these claims.  Specifically, they argue that Plaintiffs lack standing and fail to allege any violation of either

the Voting Rights Act or HAVA.

A.      Voting Rights Act of 1965

        Section 1973(a) of the Voting Rights Act prohibits state or political subdivisions from imposing a

"voting qualification or prerequisite to voting or standard, practice, or procedure . . . in a manner which

results in a denial or abridgement of the right of any citizen of the United States to vote on account of race

or color."  Section 1973(b) creates a private cause of action for the enforcement of subsection (a).

Defendants maintain that Plaintiffs have no standing to sue under the Voting Rights Act as they are not

"aggrieved persons."

        The purpose of the Voting Rights Act was to "banish the blight of racial discrimination in voting"

in selected States. *See South Carolina v. Katzenbach*, 383 U.S. 301, 308  (1966).  Standing under the

Act is limited to "aggrieved persons," and that category is confined to persons whose voting rights have

been denied or impaired. *McGee v. City of Warrensville Heights*, 16 F. Supp.2d 837, 845 (N.D. Ohio

1998) (citing *Roberts v. Wamser*, 883 F.2d 617, 621, 624 (8th Cir. 1989).

        To obtain injunctive relief for violations of § 1973(a), the Plaintiffs must show, among other things,

that Defendants infringed on their right to vote on account of race.  While Plaintiffs were engaged in the act

of registering voters, they provide no evidence that Defendants interfered with their own right to vote.  Nor

do Plaintiffs provide sufficient evidence of a discriminatory intent to interfere with this right.  While they

allege that the Defendants targeted them based on their race, Plaintiffs do not show that Defendants

intended to interrupt their attempts to register voters because Plaintiffs were African American or because

-11-

Case No. 5:04-CV-2151
Gwin, J.

Plaintiffs were attempting to register African American voters.  While Plaintiffs do provide some evidence that Defendants knew or at least learned at some point that Plaintiffs were at the parade for a voter registration drive, Plaintiffs do not show that Defendants detained Plaintiffs with the purpose of stopping these activities.  Instead, the evidence shows that Defendants stopped the Plaintiffs due to a belief that Plaintiffs were suspects in the vehicle theft.  Even if Plaintiffs can show that Defendants' reasons for suspecting Plaintiffs involvement in this theft was based in part on racial bias, the problem remains that Plaintiffs cannot link this bias with an intent to prevent voter registration activities.

In their opposition to Defendants' motions for summary judgment, Plaintiffs also purport to rely on § 1973i(b) of the Voting Rights Act, which states, "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under § 1973a(a), 1973d, 1973f, 1973g, 1973h, or 1973j(e) of this title."  This section deals not only with an individual's right to vote, but more broadly with activities such as voter registration.  However, while Congress did create a private cause of action with regard to § 1973(a), it is not clear that Congress intended to create such a cause of action for § 1973i(b).  This is evidenced by § 1973j of the Act, which deals with civil and criminal sanctions.  Section 1973j specifically gives the Attorney General the power to institute an action for injunctive relief in connection with violations of § 1973i, but states nothing about the right to individual citizens to seek such relief:  "Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any

-12-

Case No. 5:04-CV-2151
Gwin, J.

act or practice prohibited by § 1973, 1973a, 1973b, 1973c, 1973e, 1973h, 1973i, or subsection (b) of

this section, the Attorney General may institute for the United States, or in the name of the United States,

an action for preventive relief, including an application for a temporary or permanent injunction." 42 U.S.C.

§ 1973j.

Where courts have allowed individual plaintiffs to seek relief for violations of § 1973i, they have

required that the plaintiff show evidence of racial discrimination, citing the purpose of the Voting Rights Act.

For example, in *Willing v. Lake Orion Community Schools Bd. of Trustees*, 924 F. Supp. 815, 820

(E.D. Mich.1996), the United States District Court for the Eastern District of Michigan dismissed the

plaintiff's claim under 42 U.S.C. § 1973i(b) because she did not provide sufficient evidence of invidious

racial discrimination. The court stated,

> Similarly, Willing's claims against Larry Gruber fail to state a claim under 42 U.S.C. §
> 1973i. Section 1973i(a) prohibits any person acting under color of state law from failing
> or refusing "to permit any person to vote who is entitled to vote under any provision of this
> Act or is otherwise qualified to vote," or from "willfully refus[ing] to tabulate, count, and
> report such person's vote." Section 1973i(b) prohibits individuals acting under color of
> state law, or otherwise, from intimidating, threatening or coercing any individual for voting
> or attempting to vote. These sections are enforcement provisions of the Voting Rights Act's
> comprehensive scheme to eliminate racial discrimination in the conduct of public elections.
> *Powell v. Power*, 436 F.2d 84, 86-87 (2d Cir.1970) (declining an opportunity to convert
> the Voting Rights Act into "a general mandate in which Federal courts may correct election
> deficiencies of any sort."). Absent a claim of any racial or other intentional invidious
> discrimination, the Voting Rights Act does not provide Willing a remedy. *Id.* at 87.
> Willing's federal Voting Rights Act claims should be dismissed.

*Id.* As discussed above, the Plaintiffs in the instant case failed to show sufficient evidence of intentional

invidious discrimination. The Court thus finds that Plaintiffs' claims under the Voting Rights Act fail as a

matter of law.

-13-

Case No. 5:04-CV-2151
Gwin, J.

B.      Help America Vote Act

Nor have Plaintiffs established a genuine issue of material fact as to their HAVA claim.  The United States Congress passed HAVA in response to problems such as people being turned away from polling stations when election workers cannot find their names on a list of eligible voters.  H.R. REP. NO. 107-329, at 38 (2001).  HAVA addresses this problem by creating a provisional ballot system in which people who believe they are eligible to vote but whose names do not appear on a particular polling station list can submit a provisional ballot.  This ballot is only counted if the voter's eligibility is later verified.  *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004).

In relation to the portion of HAVA setting forth the guidelines for the provisional balloting system, 42 U.S.C. § 15512 does require each state to create a process by which individuals may file complaints under Chapter III of HAVA.  However, Plaintiffs do not claim that Defendants have violated any portion of HAVA dealing with provisional voting.  Instead, Plaintiffs cite to 42 U.S.C. § 15521, the portion of HAVA establishing the "Help America Vote College Program," which the Election Assistance Commission created "to encourage students enrolled at institutions of higher education (including community colleges) to assist State and local governments in the administration of elections by serving as nonpartisan poll workers or assistants; and to encourage State and local governments to use the services of the students participating in the Program."  42 U.S.C. § 15521(b).

Plaintiffs are two college students who were volunteering with the America Coming Together program to register voters for the upcoming election.  They essentially claim that Defendants violated this section by interfering with the voting registration team's efforts to register voters.  In as much as the

-14-

Case No. 5:04-CV-2151
Gwin, J.

America Coming Together registration project enlisted the assistance of college students in a nonpartisan effort to encourage voter registration, the Plaintiffs' activities at least appear to be in line with the general policy considerations underpinning § 15521. However, given the purpose of the Act, this section more likely specifically targets election day procedures, focusing on recruiting college students to monitor the polls on election day and provide assistance to state and local poll workers. Indeed, § 15521 makes no mention of such pre-election programs such as voter registration drives. Moreover, the Court agrees with Defendants that the Plaintiffs have failed to establish that 42 U.S.C. § 15521(b) creates a private remedy for their claim. The Court found no statutory language authorizing sanctions for a violation of this section. Congress specifically called for the creation of a grievance procedure for the portion of HAVA dealing with provisional ballots but provided for no such enforcement mechanism regarding the Help America Vote College Program. This omission strongly supports the conclusion that Congress did not intend to create a private cause of action under § 15521. As such, the Court dismisses Plaintiffs' HAVA claims against all Defendants.

II.      Plaintiffs' § 1983 Claims

Plaintiffs Dorsey and Clark sue Defendants under 4 U.S.C. § 1983 for excessive use of force, unlawful detention and false arrest, and racial profiling in violation of Plaintiffs' constitutional rights. Section 1983 gives this Court jurisdiction over actions seeking recovery for constitutional deprivations suffered under the color of state law. 42 U.S.C. § 1983 (stating that every person who, under color of state law, causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ."); *Foy v. City of Berea*, 58 F.3d 227, 229 (6th Cir. 1995) ("In order

Case No. 5:04-CV-2151
Gwin, J.

to prevail in a section 1983 action, the plaintiff must prove that some conduct by a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or other federal laws.").

A.      Claims Against the State of Ohio

Defendants State of Ohio, Mendenhall, and Woodward argue they are entitled to Eleventh Amendment immunity on all of Plaintiffs' 42 U.S.C. § 1983 claims and that in any case a state is not a "person" who can be held liable under § 1983.  In as much as Plaintiffs' claims against Defendants Mendenhall and Woodward in their official capacities are actually claims against the State of Ohio, the claims against the individual defendants will be considered as part of Plaintiffs' claims against the State.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  Eleventh Amendment immunity prevents federal courts from exercising jurisdiction over a claim, and bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 101-01 (1984); *see also Haas v. Quest Recovery Services, Inc.,* 338 F. Supp.2d 797, 800 (N.D. Ohio 2004).  Eleventh Amendment immunity extends to suits against a state by that state's own citizens. *S.J. v. Hamilton County*, 374 F.3d 416, 419 (6th Cir. 2004). Moreover, "when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst*, 465 U.S. at 101-02 (1984) (citing *Cory v. White*, 457 U.S. 85, 91 (1982)).

The Eleventh Amendment does not apply in two situations: (1) if Congress has abrogated the state's

-16-

Case No. 5:04-CV-2151
Gwin, J.

immunity, or (2) if the state has waived its immunity from suit in federal court. *Thiokol Corp. v. Dept. of Treasury*, 987 F.2d 376, 381 (6th Cir.1993). It is well settled that Congress did not abrogate the States' Eleventh Amendment immunity when it enacted 42 U.S.C. § 1983. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 (1997). Furthermore, the State of Ohio denies consenting to this suit through its motion for summary judgment. In the present suit, Plaintiffs sue the state of Ohio and two State of Ohio Troopers in their official capacity for monetary damages and such other relief as the Court finds appropriate. The Court finds that Plaintiffs' claims are barred by the State's Eleventh Amendment Immunity.

In the alternative, the Court also finds that Defendant State of Ohio is not a "person" within the meaning of 42 U.S.C. § 1983. *See Howlett By & Through Howlett v. Rose*, 496 U.S. 356 (1990). On the other hand, where a state official is sued in his or her official capacity for prospective injunctive relief, the suit may proceed as such claims are not treated as actions against the state. Plaintiffs thus argue that they are entitled to injunctive relief as pertains to their § 1983 claims. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989).

To prevail on a claim for injunctive relief, the plaintiff must show that: (1) he is likely to succeed on the merits, (2) he will suffer irreparable injury in the absence of an injunction, (3) the injunction will not cause substantial harm to others, and (4) the injunction will serve the public interest. *Frisch's Restaurant Inc. v. Shoney's*, 759 F.2d 1261, 1263 (6th Cir. 1985). The United States Supreme Court has explained that injunctive relief is only appropriate where the Plaintiff can show a "real or immediate threat that the plaintiff will be wronged again – a 'likelihood of substantial and immediate irreparable injury.'" *Los Angeles*

-17-

Case No. 5:04-CV-2151
Gwin, J.

*v*. *Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v*. *Littleton*, 414 U.S. 488, 502 (1974)).  The

Supreme court also found in *Lyons* that the vague threat of general future harm to society was insufficient

to confer standing.  *Id*. ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons

is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not

entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement

officers are unconstitutional.").  The Sixth Circuit has followed the Supreme Court's reasoning, finding that

a Plaintiff lacks standing to sue for injunctive relief unless he can show a substantial likelihood of

particularized harm.  *Kardules v. City of Columbus,* 95 F.3d 1335, 1347 (6th Cir. 1996).

Based on the above standard, the Court finds that Plaintiffs have not shown a sufficient basis for

injunctive relief.  Plaintiffs fail to provide any evidence that they suffer a real and immediate threat of future

harm.  Plaintiffs assert that there exists a significant threat that their constitutional rights would be violated

if they attempted to register voters in or around Brady Lake again.  However, this assertion is little more

than mere speculation.  Plaintiffs have not alleged that they are currently still volunteering in the voter

registration program.  Nor have Plaintiffs shown that their individual constitutional rights are still threatened.

While Plaintiffs' allegations of police misconduct may shed doubt on certain practices of the Defendants,

they have not shown that these practices pose any more than a possible threat to society at large.  As such,

the Court finds that injunctive relief would not be appropriate at the present time.  The Court thus grants

Defendants State of Ohio, Mendenhall, and Woodward's motions for summary judgment.

B.      Section 1983 Claims Against Municipalities

Just as with Plaintiffs' claims against the State Officers in their official capacities, Plaintiffs' claims

-18-

Case No. 5:04-CV-2151
Gwin, J.

against Defendants Begin, Dawson, and Barber in their official capacities are essentially claims against the local governments or municipalities. *See Taylor v. Franklin County, Ky.*, 104 Fed. Appx. 531, 541 (6th Cir. 2004) (citing *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1244 (6th Cir.1989)) ("A suit against an individual 'in his official capacity' has been held to be a suit directly against the local government unit and may result in the municipality's liability."). As such, these claims are considered together with Plaintiffs claims against the City of Brady lake and Portage County.

The above-named Defendants maintain that they are entitled to summary judgment as Plaintiffs cannot prove that Defendants engaged in a custom or policy that violated Plaintiffs' constitutional rights. Plaintiffs, in opposition, argue that Defendants Brady Lake and Portage County have engaged in a custom or policy of improperly training their employees.

While a municipality is subject to suit under § 1983, *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978), a municipality does not incur § 1983 liability based solely on the unconstitutional acts of its employees. That is, a municipality cannot be held liable on a theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694-95. Rather, a plaintiff must show that the municipality's own policies or customs proximately caused the constitutional violation: "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

A government entity incurs liability under § 1983 only when its failure to train served as the "moving force" behind an underlying constitutional violation. *Id*. at 658; *City of Canton*, 489 U.S. at 391 (stating

-19-

Case No. 5:04-CV-2151
Gwin, J.

that failure to train would not lead to municipal liability unless the plaintiff could prove that "deficiency in

training actually caused the police officers' indifference to her medical needs"). Furthermore a plaintiff must

show that the municipality's  failure to train its officers amounts to deliberate indifference to the rights of

persons with whom the police came into contact. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th

Cir.1994) (citing *City of Canton*, 489 U.S. at 388-89).   A municipality's deliberate indifference to the

rights of persons with whom the police come into contact transform its conduct into a "policy or custom"

that is actionable under § 1983. *City of Canton*, 489 U.S. at 388-89.

Even if Plaintiffs can successfully show that the actions of Defendants Begin, Dawson, and Barber

amount to a violation of Plaintiffs' constitutional rights, Plaintiffs offer no evidence that these actions resulted

from a policy of improper training that is deliberately indifferent to the rights of individuals.  The only real

evidence that Plaintiffs point to is the fact that Defendant Portage County Parks District has no written

policies with regard to arresting people.  Aside from this, Plaintiffs rely solely on the alleged behavior of

Defendants Begin, Dawson, and Barber to prove the existence of inadequate training, essentially stating

that if the Defendants had been trained properly they would not have responded to the Plaintiffs in the

manner they did.  While Plaintiffs are not required to point to a written policy in order to establish municipal

liability, they may not rely on mere inferences drawn from a single incident of alleged police misconduct.

To do so would be to essentially allow a claim of respondeat superior against a municipality.  *Monell* clearly

prohibits such a result.  Plaintiffs are thus required to offer at least some evidence of an actual training policy

or procedure and the weaknesses of that policy.  Rather than point to evidence of some existing policy or

custom that led to or caused Defendants' actions, Plaintiffs ask the Court to infer the existence of a

Case No. 5:04-CV-2151
Gwin, J.

deliberately indifferent training policy *based* on Defendants' individual actions. The Court thus grants

Defendants motions for summary judgment as to Plaintiffs' claims against Portage County, Brady Lake,

and Begin, Dawson, and Barber in their official capacities.

C.    Section 1983 Claims Against Officers in Their Individual Capacities.

The Court is thus left only with Plaintiffs' independent capacity claims against Defendants Begin,

Dawson, and Barber. In response to these claims, Defendants argue they are entitled to summary judgment

because (1) Plaintiffs improperly pled their excessive force, unlawful detainment, and false arrest claims

under the Fourteenth rather than the Fourth Amendment, (2) Defendants' actions did not amount to a

violation of Plaintiffs' constitutional rights, and (3) Defendants are entitled to qualified immunity.

1.    Excessive Force, Unlawful Detainment, and False Arrest

In this case, the Court is faced with the rare situation in which a plaintiff alleges excessive use of

force, unlawful detainment, and false arrest claims under the Fourteenth rather than the Fourth Amendment.

Defendants argue that the Court must dismiss such claims. Defendants specifically cite *Phebus v. City of*

*Memphis*, 340 F. Supp.2d 874 (W.D. Tenn. 2004), pointing to the following passage:

> The Plaintiff's Fourteenth Amendment claim is also without merit. The Fourth Amendment,
> which applies to the states pursuant to incorporation by the Fourteenth Amendment,
> protects "the right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures." U.S. Const. amend. IV. These protections
> apply equally to civil and criminal cases. Daughenbaugh v. City of Tiffin, 150 F.3d 594,
> 598 (6th Cir.1998). The Supreme Court has held that "when government behavior is
> governed by a specific constitutional amendment, due process analysis is inappropriate.
> Although not all actions by police officers are governed by the Fourth Amendment, the
> constitutionality of arrests by state officials is governed by the Fourth Amendment rather
> than due process analysis." Berg v. County of Allegheny, 219 F.3d 261, 268-69 (3d
> Cir.2000), cert. denied,531 U.S. 1072, 121 S.Ct. 762, 148 L.Ed.2d 664 (2001) (citing
> County of Sacramento v. Lewis, 523 U.S. 833, 842-43, 118 S.Ct. 1708, 140 L.Ed.2d

-21-

Case No. 5:04-CV-2151
Gwin, J.

> 1043 (1998)) (internal citations omitted); *see also Alexander v. Beale Street Blues Co., Inc.*, 108 F. Supp.2d 934, 940-41 (W.D. Tenn. 1999). As there does not appear to be any dispute among the parties that the Fourth Amendment is applicable to this case, the Plaintiff's claims arising under the Fourteenth Amendment are DISMISSED

.

*Id.* at 880.

Other courts, however, have chosen to construe similar claims as Fourth Amendment claims. See *Shealy v. Caldwell*, 16 Fed. Appx. 388, 398-99 (6th Cir. 2001) (Unpublished.) (District court erred in dismissing case phrased as a claim under the Fourteenth Amendment when the claim sufficiently advised the defendant that the plaintiffs were making a claim for unreasonable searches and seizures under the Fourth Amendment.) In *Crandall v. City of Chicago*, 2000 WL 705987 (N.D. Ill. 2000), the court construed a plaintiff's claim for false arrest under the Fourteenth amendment as a claim under the Fourth Amendment. Additionally, in *Carr v. Tatangelo*, 156 F. Supp.2d 1369, 1378 (M.D.GA. 2001) the Federal District Court for the Middle District of Georgia suggested that where claims are ambiguous and where the plaintiffs ague in their briefs or oral arguments that their initial excessive force claims are based on the Fourth as well as the Fourteenth Amendment, the court can at its discretion infer or construe the plaintiffs' claims as arising under the Fourth Amendment. *See also O'Neal v. DeKalb County, Georgia*, 850 F.2d 653, 656 n.4 (1988).

In the present case, Plaintiffs clearly asserted claims for excessive force, unlawful detention, and false arrest in their original complaint. While they initially cited only the Fourteenth Amendment as a basis for these claims, Plaintiffs later suggest they also intended the claims to be brought under the Fourth

Case No. 5:04-CV-2151
Gwin, J.

Amendment.[5/]  Plaintiffs further argue that their claims were properly pled as "substantive rights (such as rights protected by the Fourth Amendment) may be enforced via § 1983 and the Fourteenth Amendment."[6/] As discussed below, the Court finds that Plaintiffs' excessive force, unlawful detention, and false arrest claims have merit.  Moreover, the Court considers the Plaintiffs' complaint to allege a Fourth Amendment violation and will construe these claims as properly arising out of the Fourth rather than the Fourteenth Amendment.

2.      Violation of Plaintiffs' Constitutional Rights

        Defendants argue in the alternative that even if Plaintiffs' § 1983 excessive force, wrongful detention, and false arrest claims are properly pled,  Defendants' alleged actions did not amount to a violation of Plaintiffs' constitutional rights.  Defendants' also contend the Plaintiffs set forth insufficient evidence to establish a claim of racial profiling.  The Court addresses the sufficiency of each claim below.

a.      Claims Against Defendants Begin, Dawson, and Barber for Excessive Use of Force

        In the present case, Plaintiffs claim that Defendant Begin pointed his weapon at Plaintiffs and forced them to lie face down on the concrete for nearly twenty minutes.  In addition, at some point during this period, Officer Dawson arrived and handcuffed the Plaintiffs while they continued to lie face down. Plaintiffs contend that under the specific circumstances of this case, Defendants' actions amount to an excessive use of force.

        The Fourth Amendment's prohibition of unreasonable seizures limits the amount of force police

_____

[5/] See Pl. Br. Opp. Defs. Mendenhall and Woodward's Mot. Sum. Judg. at 10.

[6/] Id. at 11.

Case No. 5:04-CV-2151
Gwin, J.

officers may use during an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Specifically, officers

may use only the degree of force necessary to effect an arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102

(6th Cir. 1997).

In *Graham,* the Supreme Court held that claims that law enforcement officers have used excessive

force during an arrest should be analyzed under the Fourth Amendment and its "reasonableness" standard.

*Id.* at 395. In determining the reasonableness of the force used under the Fourth Amendment, courts must

carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests'

against countervailing governmental interests at stake." *Id.* at 396.

In evaluating a particular use of force, the Court does not second-guess an officer's judgment from

the comfort of chambers. Rather, the Court asks whether a reasonable officer on the scene would have

employed a similar degree of force. *Smith v. Freeland*, 954 F.2d 343, 345-47 (6th Cir. 1992); *Monday*,

118 F.3d at 1104.

In *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989), the Sixth Circuit adopted the view of the

Fifth Circuit that a show of force by pointing a gun is different from the actual use of force and that in

general a police officer's act of pointing a gun at a suspect is not an excessive use of force. However, the

facts of *Collins* can be distinguished from the present case. In *Collins*, mining investigators arrested two

individuals suspected of operating illegal mines. The Sixth Circuit specifically notes that during the arrest

the two suspects refused to identify themselves and were resisting arrest. *Id*. In addition, the defendant

mining investigator only drew his weapon after a third unidentified individual arrived on the scene and

refused to leave, causing the investigator to fear the situation may escalate to violence. *Id*. Moreover, the

-24-

Case No. 5:04-CV-2151
Gwin, J.

Sixth Circuit later narrowed its holding in *Collins*, stating that "We do not construe Collins as holding that the pointing or displaying of a firearm can never constitute excessive force; rather, we believe that Collins requires us to consider all the circumstances of a situation before determining whether such an action rises to the level of excessive force." *Davis v. Bergeon*, 187 F.3d 635, 1999 WL 591448, 6 (6th Cir. 1999). In Davis, the Sixth Circuit also notes that physical contact is not "essential element of an excessive force claim." *Id*.

Other courts have held that under certain circumstances, a police officer's act of drawing a weapon can amount to excessive force. For example, in *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002), the Ninth Circuit found sufficient evidence of excessive use of force where the defendant police officer pointed his weapon at close range at an unarmed man who was suspected of shooting a neighbor's dog, while the man was handcuffed and detained.

In determining whether the there is a genuine issue of fact with regard to whether Defendants Begin and Dawson used excessive force, this Court is guided by the principle set forth in *Graham* that the facts and circumstances of each case must be measured, paying careful attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade by flight. 490 U.S. at 396-97.

Viewing the facts in a light most favorable to the Plaintiffs, the Court finds that under the circumstances of the present case, Plaintiffs do point to sufficient evidence to warrant denial of summary judgment. First, as will be discussed below, there is little to show that the defendants had reasonable suspicion, let alone probable cause to arrest the Plaintiffs. Defendants knew nothing more about the

Case No. 5:04-CV-2151
Gwin, J.

plaintiffs other than that they allegedly matched the vague descriptions of two African American vehicular

theft suspects.  This is also the only basis Defendants can claim for any belief that the Plaintiffs were

possibly armed or dangerous.[2/]

      If anything, the circumstances of the arrest show that a reasonable officer would have concluded

upon approaching Plaintiffs they posed little if any threat.  For example, Defendant Begin admits in his

deposition testimony that when he approached the Plaintiffs they were doing nothing suspicious, did not

appear to be armed, and did not cause Begin to fear for his safety.  The facts also show that Plaintiffs did

not resist arrest.  They did initially ask why they were being stopped.  However, Defendant Begin stated

that he thought this was because Plaintiffs were surprised and did not believe the officer was talking to them.

Indeed, when Plaintiffs did not respond right away to Defendant Begin's request that they stop walking,

it was not because they were attempting to resist him, but rather because they did not understand that Begin

was calling out to them.  Once they realized this, they merely asked Officer Begin why he was stopping

them.  They did not try to run.  They showed no signs of violent behavior.  Still, rather than asking the

Plaintiffs what they were doing in that area or what they had been doing earlier that morning, questions that

surely would have dispelled any suspicion that Plaintiffs were involved in the car theft, Defendant Begin

drew his weapon and forced Plaintiffs to lie face down on the concrete while he waited for backup.

      When Defendant Dawson arrived, the Defendants had yet another opportunity to de-escalate the

situation.  However, rather than allowing the Plaintiffs to stand up and inquiring into Plaintiffs' situation

before taking further action, Defendant Dawson handcuffed Plaintiffs and continued to force to lie on the

_____

[2/] *See* Begin Depo. at 56-61.

-26-

Case No. 5:04-CV-2151
Gwin, J.

ground.  Plaintiffs were finally allowed to stand when Officer Woodward arrived on the scene.[8]

The Court does not dismiss the fact that the Defendants were seeking two individuals they believed might have been involved in a vehicle theft.  Nor does it discount the seriousness of this crime or suggest that the officers would not have been justified in approaching the Plaintiffs with apprehension.  However, given the Plaintiffs' cooperation and the lack of any corroborating circumstances suggesting they actually were the individuals involved in the morning incident, the Defendants should have discovered Plaintiffs' innocence at some point much earlier in the encounter than they did.  Under the circumstances, the level of force used by the Defendants to secure two individuals who neither resisted nor attempted to flee was at the least arguably excessive.  The Court thus denies Defendants Begin and Dawson's motions for summary judgment as to Plaintiffs' excessive force claims.

As to Defendant Barber, the Court finds no evidence that he engaged in the encounter between Begin, Dawson, and the Plaintiffs.  While Plaintiffs allege in their complaint that Barber was present at the scene, there is no allegation that he had any interaction with Plaintiffs.  Furthermore, Plaintiffs presented no evidence to support their own allegations that Barber was present.  The Court thus grants Defendant Barber's motion for summary judgment with regard to the excessive force claim.

b.     Claims Against Defendants Begin, Dawson, and Barber for Wrongful Detention and Arrest

Defendants claim that their seizure of the Plaintiffs amounted to nothing more than a valid investigatory detention or *Terry Stop* based on sufficient reasonable suspicion.  Alternatively, they argue that even if the Court finds the seizure amounted to a *de facto* arrest, Defendants had probable cause and

---

[8]  The Court also notes Woodward's deposition statement that when he arrived he saw no need for the Plaintiffs to lie on the ground.  Woodward Depo. at 67.

Case No. 5:04-CV-2151
Gwin, J.

thus did not violate Plaintiffs' constitutional rights.  Just as above, the Court finds insufficient evidence to connect Defendant Barber with the alleged unlawful detention and arrest of the Plaintiffs.  The Court thus dismisses these claims as against Defendant Barber.  The Court finds, however, that questions of fact remain with regard to Plaintiffs' claims against Defendants Begin and Dawson.

Police officers may initiate an investigatory detention only if they have reasonable suspicion of criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).  An officer must be able to point to specific and articulable facts, together with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred or is imminent.  Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring "articulable reasons" and "a particularized and objective basis for suspecting the particular person . . .of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

As the Supreme Court explained in *Terry*, a seizure occurs when an officer uses some form of coercion causing an individual to feel he is not free to leave: "Obviously, not all personal intercourse between policemen and citizens involve seizures of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." 392 U.S. at 19 n.16 (internal quotations omitted).  The test is whether, considering all of the circumstances, "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id*.

In the present case, Defendants first claim that the July 10, 2004 encounter with Plaintiffs was nothing more than a valid investigatory detention.  Given that Officer Begin pointed his weapon at the

-28-

Case No. 5:04-CV-2151
Gwin, J.

Plaintiffs and forced the Plaintiffs to lie face down before Officer Dawson handcuffed them, this argument strains credulity.  Even more, the Defendants show insufficient evidence that they had probable cause to arrest the Plaintiffs or a sufficient suspicion to stop the Plaintiffs.  The Court finds Plaintiffs have submitted sufficient evidence to at least establish a question of fact as to whether Defendants had the necessary reasonable suspicion to detain the Plaintiffs.

As discussed above, the Defendants never saw Plaintiffs engaged in any suspicious behavior. Defendants' sole basis for suspicion of the Plaintiffs is the BOLO that was transmitted based on Defendant Barber's call to the Ohio State Patrol dispatcher.  This BOLO gave only the location of the Plaintiffs and vaguely described them as two black males, one wearing a white jersey and the other a blue jersey, one of whom had cornrows in his hair.  Moreover, Defendant Barber initially identified the Plaintiffs as possible suspects based solely on an equally vague BOLO that had gone out earlier that morning.  This BOLO described the two allegedly suspicious black males who Robinson had picked up in the area the area of the morning police chase just after it occurred.  Notably, this police chase occurred in an entirely different location than the Brady Lake Parade and at a much earlier point in the morning than when Defendant Barber spotted the Plaintiffs.  Adding to the lack of probable cause, the Plaintiffs were soliciting voter registration along a parade route.  The Defendants are left to suggesting that, after stealing a vehicle and engaging in a high-speed chase with police officers, the perpetrators of the car theft would move to voter registration.

In *United States v. Hensley*, 469 U.S. 221, 232 (1985) the Supreme Court held that police officers could rely on police bulletins or dispatch reports as a basis for reasonable suspicion when detaining

-29-

Case No. 5:04-CV-2151
Gwin, J.

an individual. *See also Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003). In *Hensley* the Supreme Court stated that "if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop." 469 U.S. at 232. On the other hand, "[i]f the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment." *Id*. Thus, the first inquiry is whether the dispatcher had sufficient information to find reasonable suspicion for a Terry stop. Based on an objective reading of the police flier at issue in *Hensley*, the Supreme Court found that it was reasonable for the officer to believe that the suspect was at least wanted for questioning and investigation by the police department. The Court stated that this would justify a *brief* stop or detention for the purpose of identifying the suspect and questioning. *Id*. at 234.

In the present case, Defendant Barber's only reason for believing that the Plaintiffs were the suspects involved in the morning police chase was that they were black and wearing "sports clothes."[2] He did not view Plaintiffs engaged in any behavior that would give rise to suspicion. Furthermore, Plaintiffs were not even in the area of the police chase when Barber spotted them. Plaintiffs were simply walking among the parade crowd. Thus, the only basis Barber had for suspecting the plaintiffs was an utterly vague description of two black men that could have applied to almost any young African American male. This at least raises a question of fact as to whether Defendant Barber's description of the Plaintiffs as suspects in the vehicle theft was based on reasonable suspicion. This also, in turn, raises an issue of fact as to whether Defendants Begin and Dawson can rely on the BOLO they heard as a basis for reasonable

---

[2] Barber Depo. at 41.

Case No. 5:04-CV-2151
Gwin, J.

suspicion.

The Court finds nothing in the BOLO giving reasonable suspicion to support stopping the Plaintiffs. However, even if the Court were to find that the BOLO did give rise to reasonable suspicion, like in the *Hensley* case, it would give rise only to a level of suspicion that would justify a brief detention during which the Defendants could have identified the Plaintiffs and asked them certain questions about their whereabouts or their reasons for being at the parade. As described above, the detention of the Plaintiffs went far beyond this limited scope. The Court thus finds that there is sufficient evidence to at the very least create an issue of fact as to whether Defendants Begin and Dawson unlawfully detained the Plaintiffs.

The Court must next determine whether Defendants' detention of Plaintiffs amounted to a *de facto* arrest. There is no bright line that distinguishes an investigative stop from a *de facto* arrest. *See Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir.1999). An investigative stop may turn into an arrest through the passage of time or the use of force. *See id.* "When this occurs, the continued detention of suspects must be based upon probable cause." *Id.* In determining whether the length and manner of an investigatory stop are reasonable in light of the basis for the initial seizure, courts look to the totality of the circumstances. *U.S. v. Calderon-Valenzuela*, 211 F.3d 1270, 2000 WL 571953, 3 (6th Cir. 2000). In *United States v. Sharpe*, 470 U.S. 675, 686 (1985), the Supreme Court held that "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Thus the whether or not the length of the detention is reasonable ultimately depends on the diligence of the officer.

-31-

Case No. 5:04-CV-2151
Gwin, J.

Based on this standard, the Court finds that there is sufficient evidence that the Defendants detained Plaintiffs for an unreasonable amount of time, giving rise to a *de facto* arrest. Specifically, the Defendants forced Plaintiffs to lie handcuffed face down for nearly twenty minutes, while at least one officer pointed his weapon at them. Despite the fact that the Defendants most likely had the situation under control at the scene of the encounter, the officers then placed Plaintiffs into two separate police cars and drove them to the Ohio Sate Highway Patrol Post inn Ravenna. The Police only made their first attempt to confirm or dispel their suspicion of Plaintiffs once they arrived at the patrol post, despite the fact that, as discussed above, Defendants had numerous opportunities to do so before this point. Under these facts, whether or not Defendants Begin and Dawson made diligent efforts to inquire into Plaintiffs' suspected involvement in the early morning police chase is clearly in question. Additionally, the manner of the detention, including the remaining question as to whether the officers used excessive force, clearly casts doubt on the Defendants assertion that the encounter was nothing more than an investigatory stop.

The Defendants would only be justified in making the *de facto* arrest if they had probable cause to believe that the Plaintiffs had committed or were in the process of committing a crime. *See United States v. Watson*, 423 U.S. 411, 417-24 (1976); *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949). Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Just as with reasonable suspicion, in establishing probable cause, police officers can rely on information received from other officers or from police dispatches. However, where the dispatch lacks an underlying basis for probable cause. *See Chambers v. Maroney*, 399 U.S. 42, 419 (1970); *Warden,*

-32-

Case No. 5:04-CV-2151
Gwin, J.

*Maryland Penitentiary v. Hayden* 387 U.S. 294 (1967). As this Court has already found a question of

fact remains as to whether the BOLO that Defendants relied on was based on reasonable suspicion, it is

clear that a question of fact also remains as to whether it was based on probable cause.

      The Court further finds that even if the BOLO was based on probable cause, the BOLO alone

would arguably be insufficient to give Defendants Dawson and Begin probable cause to arrest the Plaintiffs.

In the case of *United States v. Shavers*, 524 F.2d 1094 (8th Cir. 1975), the Eighth Circuit dealt with

somewhat similar facts as the Court now faces. In *Shavers*, a police officer heard a radio dispatch that two

black males were wanted in connection with an armed robbery. The dispatch described one of the men

as being five feet, eight inches tall and wearing dark clothing and the second man only as being the same

height as the first. About ten minutes after the crime occurred and the officer heard the dispatch, he saw

a black male wearing a light suede jacket and cap and fitting the height of the suspect walking quickly away

from the scene of the crime. The Eighth Circuit held that the officers arrest of this individual was not based

on probable cause, noting that the dispatch description could have applied to many individuals in that area

and that the particular suspect's proximity to the scene was not persuasive as ten minutes had elapsed since

the robbery occurred. *Id.* at 1095.

      The Defendants in the present case arrested or detained Plaintiffs based on an equally vague police

dispatch. While there is not a large population of African Americans in Brady Lake, the Plaintiffs in this

case were nowhere near the scene of the police chase. Nor did the police dispatch state that the Plaintiffs

were seen in that area. Furthermore, several hours had elapsed between the time of the chase and time

at which Defendant Barber reported seeing the Plaintiffs in Brady Lake. At the very most, based on this

-33-

Case No. 5:04-CV-2151
Gwin, J.

information alone, the Defendants were perhaps justified in stopping the Plaintiffs and make a brief inquiry.

The Plaintiffs at no point engaged in any suspicious behavior that when combined with the BOLO would

give rise to probable cause to make an arrest.

Moreover, there Defendants were aware of certain facts during the detention that should have

dispelled their suspicion.  For example, in his deposition testimony, Defendant Begin admits to seeing that

the Plaintiffs were carrying clip boards and that they appeared surprised when he attempted to stop them.

It is not uncommon for people to go to community gatherings like parades for the purposes of getting

signatures for a petition or for registering voters, particularly during an election year.  It is thus at least

questionable whether a reasonable officer would have ordered Plaintiffs to the ground without first talking

to them about what they had been doing that morning.  Additionally, the Plaintiffs claim that they and their

white colleagues attempted to explain to the Defendants that the Plaintiffs were at the parade for the

purpose of registering voters and had been there all morning.  However, the Defendants allegedly refused

to listen.  The Court thus finds that issues of fact remain with regard to whether Defendants Begin and

Dawson validly arrested the Plaintiffs.  For the preceding reasons the Court Denies Defendants Begin and

Dawson's motions for summary judgment as to Plaintiffs' unlawful arrest and detention claims.

c.  Selective Enforcement ("Racial Profiling") Claim

Finally, the plaintiffs allege that race discrimination led to their detention or arrest.  Specifically, they

say Defendant Barber identified them as suspects in the vehicle theft solely because they were

African-American and that Defendants Begin and Barber arrested or Detained them on the basis of their

race.

Case No. 5:04-CV-2151
Gwin, J.

The Equal Protection Clause of the Fourteenth Amendment prohibits purposeful discrimination in

the enforcement of laws. Discrimination is purposeful "if it is intended to accomplish some 'forbidden aim.'"

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir.2000) (quoting *Futernick v. Sumpter Township*,

78 F.3d 1051, 1056 (6th Cir.1996)). One such "forbidden aim" is the selective enforcement of laws

because of race.

> To establish a selective enforcement claim, a plaintiff must prove three elements:
>
> First, [an official] must single out a person belonging to an identifiable group, such as those
> of a particular race or religion, or a group exercising constitutional rights, for prosecution
> even though he has decided not to prosecute persons not belonging to that group in similar
> situations. Second, [the official] must initiate the prosecution with a discriminatory purpose.
> Finally, the prosecution must have a discriminatory effect on the group which the defendant
> belongs to.

*United States v. Anderson*, 923 F.2d 450, 453 (6th Cir.1991); *Gardenhire*, 205 F.3d at 319.

The standard for establishing a selective enforcement claim is a "demanding one." *Stemler v. City

of Florence*, 126 F.3d 856, 873 (6th Cir.1997). State actors benefit from a "strong presumption that the

state actors have properly discharged their official duties, and to overcome that presumption the plaintiff

must present clear evidence to the contrary; 'the standard is a demanding one.'" *Id.*

With regard to the first element, "it is an absolute requirement that the plaintiff make at least a prima

facie showing that similarly situated persons outside her category were not prosecuted." *Id.* In this case,

it would be nearly impossible for the Plaintiffs to establish this prong. Plaintiffs do assert that they were

registering voters at the parade along with white colleagues and that these white colleagues were not

stopped or detained. However, the problem in the instant case is that the police were looking for two

*black* suspects. Thus, the white individuals at the parade were not similarly situated. Perhaps if plaintiffs

-35-

Case No. 5:04-CV-2151
Gwin, J.

were able to put forth evidence of a widespread practice of police arresting black males based on such vague suspect descriptions as are involved here, they would be able show that black males are treated differently from other males.  However, Plaintiffs have put forth no such evidence.

Additionally, the Court finds insufficient evidence that Defendants acted with a discriminatory purpose or intent.  Plaintiffs cite to evidence that an onlooker made racially biased comments in order to show the racially charged nature of the encounter.  However, the individual making those comments was not a state actor and does not shed light on any intent of the officers to detain or arrest the Plaintiffs in order to discriminate against them based on their race.  While it may be the case that underlying racial biases led the Defendants to more readily believe Plaintiffs matched the description of the vehicle theft suspects, this also does not establish an intent to discriminate.

The Court does not deny that the Plaintiffs have put forth evidence showing that Defendant Barber thought Plaintiffs matched the description of the vehicle theft suspects based on little more than their race. Unfortunately and perhaps counterintuitively, this is not enough to sustain a claim of selective enforcement. The Court thus dismisses Plaintiffs' claims for selective enforcement against Defendants Barber, Begin, and Dawson.

3. Qualified Immunity

Having found sufficient evidence of a genuine issue of material fact with regard to Plaintiffs' excessive force, unlawful arrest, and unlawful detention claims against Defendants Begin and Dawson, this Court must now address Defendants' qualified immunity defenses.

The doctrine of qualified immunity shields state and local actors from liability based on their

-36-

Case No. 5:04-CV-2151
Gwin, J.

discretionary acts. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In doing so, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole*, 504 U.S. 158, 167 (1992) ("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damage suits from entering public service.").

Nevertheless, state actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. at 818 (holding that qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Sixth Circuit Court of Appeals set forth a three-part test for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally we determine whether the Plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (internal quotation marks omitted) (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).

-37-

Case No. 5:04-CV-2151
Gwin, J.

Accordingly, in analyzing Plaintiffs' § 1983 claims, the Court looks first to whether Plaintiffs offer sufficient evidence of a constitutional violation.  If so, the Court decides whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  And third, the Court looks at whether the Defendants' actions were objectively unreasonable.

The right to be free from excessive force in the context of a seizure is clearly established.  *Adams v. Metiva*, 31 F.3d 375, 386-87 (6th Cir. 1994).  The same is true for the right not to be arrested absent probable cause or detained absent reasonable suspicion.  *See Holt v. Artis*,  843 F.2d 242, 246 (6th Cir.1988).

The Sixth Circuit in *Feathers*, 319 F.3d at 851, while noting that the officers could not rely on a police dispatch that lacked an underlying basis for reasonable suspicion to detain a suspect, also determined the officers acted in the objectively reasonable belief that they were complying with the *Terry* requirements. In other words, it was not so objectively unreasonable for defendants to rely on the police dispatch without inquiring into its foundation.  In light of this, the Court then determined that it was reasonable for the purposes of qualified immunity for the officers to detain the suspect.  *Id*.  The Court notes that in that case, when the officers first approached Feathers on his porch, Feathers did not comply with the Officers instructions to take his hands out of his pockets and then leaned through the door of the house to call for his father.  At that point the officers restrained Feathers and Feathers struggled, biting one of the officer's fingers in the process.  Only after this occurred did the officers then ay Feathers face down on the ground and handcuff him.  *Id.* at 846-47.

The facts of this case are distinguishable.  Specifically, the Court finds that while the initial stop may

-38-

Case No. 5:04-CV-2151
Gwin, J.

have been reasonable for the purposes of qualified immunity, the fact that Officer Begin almost immediately

forced the Plaintiffs to lie face down on the ground and then refused to talk to them about why he was

stopping them not objectively reasonable given that Plaintiffs did not try to resist or flee. There is also a

question of fact as to whether it was objectively unreasonable, given the circumstances for the Defendants

to continue to detain Plaintiffs in that manner after Defendant Dawson arrived, whether this is considered

a detention or a *de facto* arrest.

The Court further finds that Plaintiffs have pointed to sufficient evidence to raise doubt as to

whether Defendants' use of force was objectively reasonable. For example, Defendant Woodward,

another officer who arrived on the scene, stated in his deposition that he saw no reason for need for

Plaintiffs to lie on the ground.[10] Plaintiffs also submitted the affidavit of R. Paul McCauley, Ph.D., in which

McCauley gives the expert opinion that Defendant Begin's actions were "contrary to accepted police

practices."[11]

While the exact nature of Defendants Begin and Dawson's conduct remains in doubt, drawing

inferences in favor of the nonmoving parties, Plaintiffs Dorsey and Clark have alleged "sufficient facts

supported by sufficient evidence" showing Defendants acted in an objectively unreasonable manner.

*Dickerson*, 101 F.3d at 1158 (quoting *Adams*, 31 F.3d at 387). The Court thus denies Defendants claims

of qualified immunity.

---

[10] Woodward Depo. at 41.

[11] McCauley aff. at p. 2.

-39-

Case No. 5:04-CV-2151
Gwin, J.

<u>CONCLUSION</u>

For the reasons stated above the Court **DENIES IN PART** and **GRANTS IN PART** Defendants motions for summary judgment.  The Court finds Plaintiffs have pointed to sufficient evidence to establish a genuine issue of material fact as to their claims against Defendants Begin and Dawson in their individual capacities for use of excessive force, unlawful detention, and unlawful arrest.  The Court thus **DENIES** summary judgment as pertains to those claims.  As to all other claims discussed above, the Court **GRANTS** summary judgment.

IT IS SO ORDERED.

Dated: September 9, 2005                    s/        *James S. Gwin*
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE

-40-